Filed 7/25/14  First American Title v. Lyons CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| FIRST AMERICAN TITLE,<br><br>  Plaintiff, Cross-complainant and Respondent,<br><br>v.<br><br>GREGORY LYONS et al.,<br><br>  Defendant, Cross-defendant and Appellant. | F066661<br><br>(Super. Ct. No. 07CECG04150)<br><br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Fresno County.  Jeffrey Y. Hamilton, Jr., Judge.

Orrin Leigh Grover for Defendant, Cross-defendant and Appellant.

Law Offices of Michael J. Lampe and Michael P. Smith for Plaintiff, Cross-complainant and Respondent.

-ooOoo-

**INTRODUCTION**

A jury found Gregory Steven Lyons intentionally concealed an important fact (i.e., the existence of a judgment lien) from First American Title Insurance Company (First American) when it issued a title insurance policy and, as a result, First American was damaged in an amount equal to two-thirds of that lien.

Lyons contends the trial court erred by allowing First American to substitute him into the lawsuit for a Doe defendant, ruling that amendment related back to the filing of the original complaint, and striking his statute of limitations defense. Lyons also challenges the judgment on the grounds that (1) the award of two-thirds of the lien amount indicates the jury disregarded the instructions and reached a compromise verdict; (2) First American's proof of damages was legally insufficient; (3) First American had actual knowledge of the judgment lien and, thus, is estopped from claiming it was defrauded; and (4) Insurance Code sections 332 and 336, which address required disclosures and waivers of the right to information, bar First American's claim against him.

We reject each claim of error. First, the trial court properly allowed the Doe amendment to relate back to the filing of the original complaint. Second, Lyons is deemed to have waived his compromise verdict issue by not presenting it to the trial court before the jurors were discharged—that is, when it still could have been corrected. Third, the testimony of the claims attorney who handled Lyons's claim against the title insurance policy constitutes substantial evidence supporting the finding that First American paid off the judgment lien and, as a result, suffered damages. Fourth, on the record presented, we cannot find as a matter of law that First American actually knew the judgment lien still was attached to the property *when it issued the title insurance policy* in 2005. Fifth, Insurance Code sections 332 and 336 do not protect policyholders who, like Lyons, affirmatively misrepresent material facts in a written disclosure statement given to the insurance company.

We therefore affirm the judgment.

2.

## FACTS

*Real Property and Title Policy*

This litigation concerns a title insurance policy for real property described as Lot 200 of Tract No. 4230, Hacienda Gardens, Phase 2, in the City of Mendota (Lot 200). Lot 200 is approximately 14.2 acres.

The title insurance policy was provided by Financial Title Company in June 2002 in connection with the sale of Lot 200 by Arnold Stewart to Lyons (Policy No. 492040). Policy No. 492040 identified Financial Title Company as the agent for First American. The policy was signed by First American as the insurer, named Lyons as the insured, provided $750,000 in coverage, and was dated June 27, 2002. This litigation arose because the policy's exceptions failed to include one of the liens recorded against Lot 200.

*The Judgment Lien*

The lien in question is defined by three documents: (1) an August 16, 1994, judgment of foreclosure obtained by the City of Mendota against four individuals with the surname of Williams; (2) an August 30, 1995, tri-party agreement entered into by Stewart (successor in interest to the Williamses), the City of Mendota, and State Street Bank and Trust Company of California that modified the judgment; and (3) a stipulation and order to amend judgment of foreclosure filed by the court on January 3, 1996, and subsequently recorded (collectively, the Judgment Lien. The stipulation and order defined the amount of the Judgment Lien as $591,000.

*Chain of Title to Lot 200*

It appears that Stewart acquired an ownership interest in Lot 200 in 1994 or early 1995. During 1999, Lyons represented Stewart in a court action in Alameda County Superior Court captioned *Wendell Arnold, et al. v. Somerset Homes, et al.*, case No. H-185221-3 (*Somerset Homes*). During a December 1999 ordered examination of Stewart in *Somerset Homes*, the documents constituting the Judgment Lien were discussed.

3.

Because Lyons was acting as Stewart's attorney during the examination, Lyons learned about the existence of the Judgment Lien at that time.

In June 2002, Lyons acquired Lot 200 from Stewart. In connection with that sale and the issuance of Policy No. 492040, both Stewart and Lyons approved a preliminary title report issued by Financial Title Company. The report made no reference to the Judgment Lien. Stewart and Lyons also signed escrow instructions that included the following disclosure:

> "The undersigned Buyer(s)/Seller's hereby certify(ies) that all liens, judgments, taxes, and other obligations have been disclosed to Financial Title Company, and that there are NO additional items that exist against me/us."

The escrow instructions also provided that Lyons and Stewart agreed "to hold harmless and indemnify Financial Title Company and it's [*sic*] underwriter against all loss, damage, attorney's fees and other costs and charges which Financial Title Company or it's [*sic*] underwriter may sustain in consequences of having issued such policy or policies of Title Insurance, and not having taken exception to an item which should have been disclosed but for whatever reason, was not."

Based on the assurances given in the escrow instructions, First American underwrote Policy No. 492040.

In August 2004, Lyons and a third party entered a transaction in which the third party acquired a one-year option to purchase Lot 200. In connection with this transaction, Lyons obtained a preliminary title report from Fidelity National Title Company for Lot 200. This preliminary title report listed the Judgment Lien as item No. 18. Lyons did not make a claim against First American and Policy No. 492040 at that time.

The next year, when the third party exercised the option to purchase, Lyons (through his attorney) sent a letter to First American making a claim under Policy No.

4.

492040 based on that policy's failure to schedule an exception for the Judgment Lien. The September 14, 2005, letter to First American stated:

> "There is a pending escrow for my client to sell the subject property that was scheduled to close shortly before this wrinkle developed. My client will suffer substantial financial loss if he is unable to deliver title clear of the City of Mendota judgment. We need to assure that this lien is cleared before October 5, 2005 in order for the escrow to close on time."

As a result of the claim, First American provided title insurance to the new owner of Lot 200. About two years after receiving Lyons's claim (i.e., September 2007), First American issued a check in the amount of $591,000 made payable to US Bank National Association. The purpose of the check was to clear the Judgment Lien. Natalie Teramoto, a claims attorney for First American who handled the claim involving the Judgment Lien, testified that it was her decision to pay the lien.

## PROCEEDINGS

On December 12, 2007, First American filed a complaint against Stewart for fraud and negligent misrepresentation in connection with Policy No. 492040, the policy issued when Stewart sold real property in 2002. First American alleged that Stewart knew the Judgment Lien existed and was not listed in the preliminary title report issued by Financial Title Company in June 2002, yet Stewart failed to disclose the lien. The allegations in First American's complaint against the Doe defendants are set forth in part I.E.1, *post*.

In February 2008, Stewart filed a cross-complaint against Lyons for indemnification and breach of fiduciary duty. Stewart filed a first amended cross-complaint in June 2008. Stewart alleged that (1) Lyons was a disbarred attorney who resigned on March 31, 2006, with charges pending; (2) Lyons represented Stewart in a variety of real estate and business transactions from 1995 until at least the middle of 2004; (3) Stewart relied upon Lyons's advice; and (4) Lyons failed to either clear the

5.

Judgment Lien against Lot 200 or convey the property subject to the lien, which caused Stewart to be sued by First American.

In October 2008, Lyons completed the First American-Stewart-Lyons "litigation circle" by filing a cross-complaint against First American for breach of contract—specifically, Policy No. 492040—and declaratory relief.

In November 2009, an attorney working for First American located a transcript of the December 1999 ordered examination of Stewart in *Somerset Homes* and found where the Judgment Lien was discussed. Because Lyons acted as Stewart's attorney at that examination, First American concluded that Lyons had known about the Judgment Lien when he signed the escrow instructions in 2002. Accordingly, in December 2009, First American filed a cross-complaint against Lyons for fraud, negligent misrepresentation and express indemnity. As damages, First American's cross-complaint alleged that it had paid the $591,000 Judgment Lien.

The following month, January 2010, First American filed an amendment to its original complaint that substituted Lyons for defendant Doe 1.

In August 2010, First American filed a first amended complaint and cross-complaint against Lyons. Lyons responded to First American's action by filing an anti-SLAPP motion under Code of Civil Procedure[1] section 425.16. The trial court denied that motion and this court issued a nonpublished decision affirming the trial court's order. (*First American Title Insurance v. Gregory Lyons* (Apr. 17, 2012, F062445) [nonpub. opn.].)

After the appeal, the matter went to trial in October 2012. The jury was instructed on (1) fraud by intentional concealment, (2) negligent misrepresentation, and (3) indemnification. The verdict form contained questions for each of these theories and a

---

[1]     All further statutory references are to the Code of Civil Procedure unless noted otherwise.

6.

final question about First American's total damages. Only the indemnification claim required an assignment of the responsibility for First American's harm among Lyons, Stewart and Financial Title Company. Specifically, the jury verdict's fourth question asked the jury to assign that responsibility by using percentages.

On October 30, 2012, the jury returned a verdict. The first question in the verdict form asked: "Did [Lyons] intentionally conceal an important fact which caused [First American] to issue a title insurance policy?" The jury answered "Yes" and, pursuant to the directions given, skipped to the fifth question, which asked about First American's total damages.[2] Despite the testimony that First American paid $591,000 to clear the Judgment Lien, the jury found First American's total damages were $394,000.

In November 2012, Lyons filed a motion for new trial or for judgment notwithstanding the verdict (JNOV). In support of these motions, counsel for Lyons submitted a declaration that stated:

> "In the posttrial discussions between counsel and the [j]ury, members of the jury stated that they debated whether to award 50% of the claimed damages or 2/3. The jurors did not state how they arrived at the 2/3 award."

The trial court denied Lyons's posttrial motions and Lyons filed a timely notice of appeal.

**DISCUSSION**

I.      DOE DEFENDANTS AND RELATION BACK

    A.      <u>Contentions of the Parties</u>

Lyons contends that the trial court erred in ruling that First American's Doe amendment was proper and striking his statute of limitations defense. Lyons supports this contention with three arguments. First, the Doe amendment was improper because

---

[2]      The jury did not address the second through fourth questions about negligent misrepresentation, indemnification, and the assignment of percentages of responsibility among Lyons, Stewart and Financial Title.

7.

First American elected to file a cross-complaint against him *before* it filed the Doe amendment and First American is bound by its initial choice of pleading. Second, First American's Doe amendment does not relate back to the December 2007 filing of First American's original complaint against Stewart because First American was not ignorant of Lyons's name or capacity when the original complaint was filed. Third, relation back is improper because the Doe claims plead in the original complaint did not encompass the claims or capacity in which Lyons eventually was sued by First American.

First American contends there is no legal authority supporting the proposition that a plaintiff is barred from filing a Doe amendment after filing a cross-complaint against the party who also is the subject of the Doe amendment. First American also contends that, although it knew who Lyons was, it was ignorant of the facts completing the elements of its misrepresentation causes of action against him until it discovered in 2009 that Lyons had known about the Judgment Lien as far back as 1999, well before he signed escrow instructions in 2002 stating all known liens had been disclosed. As to Lyons's third grounds—the inadequacy of the charging allegations against the Doe defendants—First American's respondent's brief does not address this point.

B.    Rules of Law

1.    *Section 474*

The use of Doe defendants in a pleading is authorized by section 474, which provides in pertinent part: "When the plaintiff is ignorant of the name of a defendant, he must state that fact in the complaint, … and such defendant may be designated in any pleading or proceeding by any name, and when his true name is discovered, the pleading or proceeding must be amended accordingly …."

The purpose of section 474 is to enable a plaintiff to avoid the bar of the statute of limitations when he is ignorant of the identity of the defendant. (*Olden v. Hatchell* (1984) 154 Cal.App.3d 1032, 1037.) To implement this purpose, courts have given the

8.

statutory text an expansive, nonliteral interpretation.  (*Marasco v. Wadsworth* (1978) 21 Cal.3d 82, 88.)

> "The phrase 'ignorant of the name of a defendant' is broadly interpreted to mean not only ignorant of the defendant's identity, but also ignorant of the facts giving rise to a cause of action against that defendant.  '[E]ven though the plaintiff knows of the existence of the defendant sued by a fictitious name, and even though the plaintiff knows the defendant's actual identity (that is, his name) the plaintiff is "ignorant" within the meaning of the statute if [plaintiff] lacks knowledge of that person's connection with the case or with [plaintiff's] injuries.  [Citations.]  The fact that the plaintiff had the means to obtain knowledge is irrelevant. [Citation.]'  [Citation.]"  (*Fuller v. Tucker* (2000) 84 Cal.App.4th 1163, 1170.)

In other words, a "'"'plaintiff is ignorant of the name of a defendant"'"' for purposes of section 474 when the plaintiff lacks actual knowledge of the defendant's identity or the defendant's culpability (i.e., the facts giving rise to a cause of action against the defendant).  (*Marasco v. Wadsworth*, *supra*, 21 Cal.3d at p. 88.)

### 2.    *Relation Back*

When an amendment identifies a Doe defendant and asserts a cause of action against that defendant not included in the original complaint, the amendment relates back to the filing of the original complaint and avoids the statute of limitations if the following conditions are satisfied.  First, the original complaint must have stated a valid cause of action against the now-identified Doe defendant.  (Rylaarsdam & Edmon, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2014) ¶ 6:740, pp. 6-181 to 6-182 (*Civil Procedure Before Trial*).)  Second, pursuant to the nonliteral interpretation given section 474, the plaintiff must have been genuinely ignorant of the defendant's identity or culpability.[3]  (*Civil Procedure Before Trial, supra,* at pp. 6-181 to 6-182.)  Third, the

---

[3]    The inquiry into genuine ignorance is based on what facts the plaintiff knew *at the time the original complaint was filed*.  (*General Motors Corp. v. Superior Court* (1996) 48 Cal.App.4th 580, 588.)  Furthermore, genuine ignorance (i.e., a lack of actual

original and amended complaint must seek a recovery based on the same general set of facts. (*Ibid.*; see *Smeltzley v. Nicholson Mfg. Co.* (1977) 18 Cal.3d 932, 934 ["same general set of facts" requirement met where "amended complaint seeks recovery for same accident and injuries as the original complaint"].)

In addition, trial courts have the discretion to deny a motion for leave to substitute a named person for a Doe defendant where (1) the plaintiff has unreasonably delayed seeking leave to amend after learning of the defendant's identity and culpability and (2) the delay resulted in actual prejudice to the defendant. (See *Smeltzley v. Nicholson Mfg. Co.*, *supra*, 18 Cal.3d at p. 939; Hogan, *California's Unique Doe Defendant Practice: A Fiction Stranger Than Truth* (1977) 30 Stan. L.Rev. 51, 87.)

### 3. Standard of Review

On appeal following a section 474 ruling: "'We review the trial court's findings of fact to determine whether they are supported by substantial evidence. [Citation.] To the extent the trial court drew conclusions of law based upon its findings of fact, we review those conclusions of law de novo.'" (*Balon v. Drost* (1993) 20 Cal.App.4th 483, 487.)

### C. Doe Amendment After First American's Cross-Complaint Against Lyons

Lyons's first ground for challenging the Doe amendment is First American's decision to file a cross-complaint against him in December 2009, before it filed the Doe amendment in January 2010. Lyons bases this challenge on the following statement by the court in *Scherer v. Mark* (1976) 64 Cal.App.3d 834: "The amended complaint was altogether a new complaint as to defendant Dr. Mark, by plaintiff's own choice of pleading." (*Id*. at p. 842.)

---

knowledge) exists even where the ignorance is the result of the plaintiff's negligence. (*Woo v. Superior Court* (1999) 75 Cal.App.4th 169, 177.)

We conclude that the foregoing statement does not lead to the conclusion that the filing of a cross-complaint against a new defendant prohibits a subsequent Doe amendment that identifies the new defendant as a former fictitiously named defendant. In *Scherer v. Mark*, *supra*, 64 Cal.App.3d 834, no "effort was made to name or designate Dr. Mark as a previously named defendant either as a fictitious Doe or by his true name" and the first amended complaint did not name him as one of the new Doe defendants. (*Id.* at pp. 841-842.)

Here, First American's Doe amendment substituted Lyons for the first Doe defendant. Thus, this case is easily distinguished from *Scherer v. Mark*, *supra*, 64 Cal.App.3d 834, "where no effort [was] made to identify the newly named defendant as one of those named as Doe in the original complaint." (*Id.* at p. 843.) First American's Doe amendment made that effort.

Because Lyons has provided no authority (and we have located none) for the proposition that an earlier filed cross-complaint bars a plaintiff from filing a Doe amendment and having that amendment relate back to the filing of the original complaint, we reject this challenge to First American's Doe amendment. For example, Lyons has not demonstrated that the doctrine of judicial estoppel bars First American from filing the Doe amendment. (See generally, *MW Erectors*, *Inc. v. Niederhauser Ornamental & Metal Works Co.*, *Inc.* (2005) 36 Cal.4th 412, 422 [five elements of judicial estoppel].)

D.    First American's Ignorance

Lyons's second ground for challenging the Doe amendment is that First American was not ignorant of Lyons's name or capacity when the original complaint was filed. The primary flaw with Lyons's presentation of this ground is that Lyons has not acknowledged that courts have construed section 474's phrase "ignorant of the name of a defendant" in a nonliteral manner to include not only ignorance of the defendant's identity, but also ignorance of the facts giving rise to a cause of action against that

11.

defendant.  (*Fuller v. Tucker*, *supra*, 84 Cal.App.4th at p. 1170.)  As a result, Lyons has not addressed when First American learned the facts giving rise to the misrepresentation claims against Lyons.  In contrast, First American has argued that, although it was aware of the *identity* of Lyons when it filed the original complaint, it lacked knowledge of facts showing he had committed a wrong against it until November 2009, when attorney Clay Schroeder discovered the transcript of a 1999 examination of Stewart in the National Archives in San Bruno, California that showed Lyons knew about the Judgment Lien as early as 1999.  First American contends the discovery of the transcript marks when it learned that the disclosure statement Lyons signed in 2002 did not accurately reflect Lyons's knowledge about the Judgment Lien.  (See *Church v. Jamison* (2006) 143 Cal.App.4th 1568, 1582 [cause of action does not accrue until it is complete in all of its elements].)

Lyons argues that First American's assertion that it did not discover the final element of its claim against him until November 2009 should not be accepted by this court because (1) First American's standard practice for investigating a claim was to absolutely check the insured's certifications right away and (2) Stewart's February 2008 cross-complaint against Lyons alleges the specific conduct that First American asserts it did not discover until November 2009.

Lyons's argument about First American's standard practice seems to be an argument that First American *should have discovered* the alleged intentional misrepresentation earlier, rather than an argument that First American actually knew about Lyons's state of mind before discovering the transcript of the debtor's examination.  As noted earlier, genuine ignorance for purposes of section 474 exists even when the lack of knowledge is the result of the plaintiff's negligence.  (*Woo v. Superior Court*, *supra*, 75 Cal.App.4th at p. 177.)  Therefore, the reference to First American's standard investigatory practices does not establish that the trial court committed factual error when

12.

it impliedly found that First American did not learn of Lyons's culpability until November 2009, about two months before filing the Doe amendment.

As to the effect of Stewart's cross-complaint against Lyons, we conclude that pleading did not provide First American with actual knowledge that Lyons knew about the Judgment Lien when he and Stewart signed the escrow instructions in 2002. The paragraph of Stewart's cross-complaint quoted in Lyons's reply brief states:

> "Despite having voluntarily accepted the trust and confidence of [Stewart] with regard to [Lot 200] and in violation of this relationship of trust and confidence, LYONS abused the trust and confidence of [Stewart] during and after termination of the attorney-client relationship by transferring [Lot 200] without disclosing all of the liens against the property which LYONS took subject to when he acquired title from [Stewart]."

These allegations about Lyons's failure to disclose all liens when Lyons *subsequently transferred Lot 200* in 2005 did not inform First American that Lyons actually knew about the Judgment Lien in 2002 when Lyons signed the escrow instructions. Therefore, Lyons has not demonstrated the trial court erred by impliedly finding that, in November 2009, First American first learned that Lyons had known about the existence of the Judgment Lien when he purchased title insurance in 2002.

In summary, Lyons has failed to show that First American was not "ignorant" (for purposes of section 474) of his culpability when it filed the original complaint or, alternatively, for an unreasonably long period of time before it filed the Doe amendment.

E.       Doe Claims in Original Complaint

1.       *Allegations in Original Complaint*

Lyons's third ground for challenging the Doe amendment is that relation back was improper because the Doe claims pleaded in the original complaint did not encompass the claims or capacity in which Lyons eventually was sued by First American.

The allegations describing the Doe defendants and their actions are set forth in the second and third paragraphs of the First American's original complaint:

13.

"2.  First American does not know the true names and capacities of the defendants named herein as Does 1 through 100, inclusive, and therefore sue these defendants by such fictitious names.  First American will amend this complaint to allege their true names and capacities when ascertained.  First American is informed and believes and thereon alleges that each of the fictitiously named defendants is legally responsible in some manner for the occurrences herein alleged, and that First American's losses as alleged herein were proximately caused by such wrongful acts.

"3.  At all times herein mentioned, each of the defendants was the agent, employee, or partner of each of the remaining defendants, and in doing the things alleged herein, was acting within the purpose, scope and course of such relationship."

Throughout the remainder of the original complaint, First American's allegations refer to "Stewart," rather than adopting the convention of referring to "defendants."  Case law establishes that the use of the plural "defendants" encompasses both the named defendant and the fictitiously named defendants.  (*Austin v. Massachusetts Bonding & Ins. Co.* (1961) 56 Cal.2d 596, 600 [first complaint's allegations about "defendants" necessarily included those designated by fictitious names]; *Civil Procedure Before Trial*, *supra*, ¶ 6:741, p. 6-182.)

### 2.    *Interpretation of Original Allegations*

The second paragraph refers to "the occurrences herein alleged" and the third paragraph uses the phrase "in doing the things alleged herein."  Elsewhere, the original complaint alleges that (1) Stewart affirmatively represented that there were no other liens or encumbrances other than the items set forth in a preliminary title report, which did not include the Judgment Lien; (2) Stewart made this representation knowing it was false and with the intent to deceive First American; and (3) Stewart's intentional misrepresentation caused First American to be damaged in the amount of the Judgment Lien—namely, $591,000.  Accordingly, the "occurrences" and the "things" mentioned in the second and third paragraphs of the original complaint are Stewart's intentional misrepresentation about the Judgment Lien and the resulting damages to First American.  Therefore, the

14.

allegation that "each of the defendants was the agent, employee, or partner of each of the remaining defendants" encompasses the theory that Stewart made the misrepresentation as the agent, employee or partner of each Doe defendant. As a result, the original complaint states a valid cause of action against the Doe defendants on the grounds that Stewart's misrepresentation is attributable to the Doe defendant as Stewart's agent or partner.

### 3. Application of "Same General Set of Facts" Test

The modern rule of relation back provides that the amended complaint will be deemed filed as of the date of the original complaint so long as recovery is sought in both pleadings on the same general set of facts. (*Smeltzley v. Nicholson Mfg. Co.*, *supra*, 18 Cal.3d at p. 936; see 5 Witkin, Cal. Procedure (5th ed. 2008) Pleading, § 1235, pp. 672-675 [modern view of amendments and relation back].) One aspect of applying the same-general-set-of-facts test concerns whether the recovery sought is for the same injuries as the original complaint.

In this case, we conclude that the intentional concealment claim upon which the jury based Lyons's liability to First American concerns the same general set of facts as those alleged in the original complaint against Stewart. First, the injury was the same—specifically, the $591,000 spent to pay off the Judgment Lien. Second, the fact allegedly concealed was the same—namely, the existence of the Judgment Lien against Lot 200. Third, the means or instrumentality through which the nondisclosure was made was the same. Both Stewart and Lyons approved the same preliminary title report that failed to include the Judgment Lien and signed the same escrow instructions. (See *Quiroz v. Seventh Ave. Center* (2006) 140 Cal.App.4th 1256, 1278 [same instrumentality].)

Accordingly, the trial court correctly determined that the claims presented against Lyons sought recovery on the same general set of facts alleged in the original complaint and, as a result, allowed the claim against Lyons to relate back to the original complaint.

II.     COMPROMISE VERDICT

        A.      Contentions of the Parties

        Lyons contends the jury disregarded the instructions and reached a compromise verdict because the jurors found fraud and, contrary to their instructions, apportioned damages.  Lyons bases this contention about apportionment on (1) the fact the jury awarded $394,000 in damages, which is exactly two-thirds of the $591,000 that First American claimed it paid to satisfy the Lien and (2) the absence of any evidence that First American paid an amount other that $591,000 to satisfy the Lien.

        First American responds with the following arguments.  First, Lyons is not entitled to a new trial because the purported error of apportioning damages was *favorable to* Lyons.  Second, Lyons waived any defect in the verdict by failing to bring the defect to the trial court's attention before the jury was discharged.  Third, Lyons has not established that the reduced damages awarded were the result of a compromise on liability.  Fourth, the verdict is properly regarded as a general verdict and is supported by substantial evidence on every single cause of action.

        Lyons's reply brief asserts that the verdict in this case is squarely within the "chance verdict" cases that require reversal of the verdict and a retrial of all issues, not just damages.  Lyons's reply brief does not address First American's argument that he waived the compromise verdict claim by not presenting it to the trial court before the jury was discharged.

B.      Waiver of Compromise Verdict Claim[4]

1.      *General Rule and Its Exceptions*

Generally, when a claimed error is based on a defect in the verdict, counsel should request its correction or clarification before the jury is discharged, and "failing this, counsel may lose the right to object." (7 Witkin, Cal. Procedure (5th ed. 2008) Trial, § 376, pp. 438-439 [and cases cited therein]; *Jensen v. BMW of North America, Inc.* (1995) 35 Cal.App.4th 112, 131 [waiver found based on failure to object to allegedly defective special verdict form prior to dismissal of jury].) This general rule regarding waiver has been explained by our Supreme Court:

> "Frequently, failure to object to the form of a verdict before the jury is discharged has been held to be a waiver of any defect. [Citations.] However, waiver is not automatic, and there are many exceptions. [Citations.] [¶] Waiver is not found where the record indicates that the failure to object was not the result of a desire to reap a 'technical advantage' or engage in a 'litigious strategy.' [Citations.]" (*Woodcock v. Fontana Scaffolding & Equip. Co.* (1968) 69 Cal.2d 452, 456, fn. 2 (*Woodcock*).)

The general rule requiring an objection is related to section 619, which provides: "When the verdict is announced, if it is informal or insufficient, in not covering the issue submitted, it may be corrected by the jury under the advice of the court, or the jury may be again sent out." (§ 619.) This provision allows for the correction of defective jury verdicts. For example, in *Redo y Cia v. First National Bank* (1926) 200 Cal. 161, the jury awarded an amount greater than the instructions allowed and the trial court instructed the

---

**4**      "Although the loss of the right to challenge a ruling on appeal because of the failure to object in the trial court is often referred to as a 'waiver,' the correct legal term for the loss of a right based on failure to timely assert it is 'forfeiture,' because a person who fails to preserve a claim forfeits that claim. In contrast, a waiver is the "'intentional relinquishment or abandonment of a known right."' [Citations.]" (*In re S.B.* (2004) 32 Cal.4th 1287, 1293, fn. 2.) Thus, the failure of a party to object before the jury was dismissed raises the issue of forfeiture rather than waiver. Nevertheless, because the parties and the cited cases use the term "waiver" in this context, we use it also.

17.

jury to retire again and bring in a verdict in conformity with the instructions. (*Id*. at p. 166.) The Supreme Court affirmed the trial court's decision, thereby establishing that the procedure set forth in section 619 can be used to correct an award of damages in an excessive amount. (*Id*. at p. 169.)

In addition, the Supreme Court has interpreted section 619 to grant a trial court the authority to send the jury back for further deliberation where the challenged verdict was the result of a *jury compromise*. (See *Crowe v. Sacks* (1955) 44 Cal.2d 590, 597-598 [trial court found compromise verdict after jury (1) failed to compensate plaintiffs for special damages indicated by evidence and (2) awarded only trifling sum for general damages; trial court had jurisdiction to send jury back for further deliberation and to instruct that its determination of issues should not be based upon compromise].)

Therefore, section 619 provides a way to correct the jury's erroneous verdict, whether that error was the result of a compromise or a misapplication of the law to the evidence when determining the amount of the damages. It follows that the failure to raise an objection and request the trial court to direct the jury to correct its verdict can result in a waiver of the claim of error.

To summarize, we conclude that a compromise verdict claim must be brought to the attention of the trial court before the jury is discharged. If not, the claim of error will be deemed waived, unless the appellant demonstrates that an exception to the rule applies to his or her situation.

### 2. *No Exception Applies in This Case*

The reporter's transcript shows that Lyons's counsel did not object to the verdict on any grounds after the jury returned its verdict and was polled. As a result, the jury was discharged by the court without any mention that an award of only two-thirds of the amount paid by First American to satisfy the lien was (or might be) a compromise

18.

verdict. Therefore, the general rule regarding waiver will govern this case unless an exception applies to the circumstances of this case.

Our inquiry into whether an exception applies is hindered by the fact that Lyons's appellate briefing has not acknowledged the existence of the waiver rule or discussed any of its exceptions. Nevertheless, we will independently consider whether "the record indicates that the failure to object was not the result of a desire to reap a 'technical advantage' or engage in a 'litigious strategy.' [Citations.]" (*Woodcock*, *supra*, 69 Cal.2d at p. 456, fn. 2.) In other words, Lyons's silence will serve as a basis for implying a waiver if Lyons obtained an advantage in the litigation by failing to object.

Our analysis of the tactical implications of the failure to object begins with an attempt to identify the jury's specific misstep. The amount of total damages found by the jury did not comport with the evidence presented. In particular, there was no legal theory and evidentiary basis for the finding that First American suffered only $394,000 in damages. The only testimony presented was that First American paid $591,000 to clear the Judgment Lien. In contrast, none of the evidence presented justifies an inference that (1) Teramoto exaggerated about the amount First American paid to clear the Judgment Lien or (2) First American's outlay was partially reimbursed or defrayed from another source.

Precisely why the jury failed to award the full amount of damages incurred cannot be determined from the record before us. It is possible that the members of the jury reached a compromise on the question of liability to agreeing to award only two-thirds of the damages incurred. It is possible that the jury misunderstood the damages instructions and believed they were to reduce the damages to account for the fault of Stewart and Financial Title Company. Alternatively, it is possible that the jury understood the instructions regarding damages, but chose to disregard them.

Uncertainty over the type of error made by the jury is significant because that uncertainty represented a risk for Lyons. Specifically, Lyons could not predict what

19.

verdict the jury would have reached if it had been sent back for further deliberations with instructions to render a verdict in accordance with the law and the evidence presented. Some of the possible outcomes were unfavorable to Lyons. For example, the jurors might have (1) unanimously found that Lyons was liable for intentional concealment and (2) corrected its finding as to total damages by awarding the full amount that First American paid to satisfy the Lien—a correction that would have increased Lyons's liability by $197,000.

The possibility of such an outcome indicates that Lyons's failure to raise the compromise verdict claim, before the jury was discharged, resulted in a technical or strategic advantage to him. The risk of a correction that increased Lyons's liability was far from hypothetical, since the jurors specifically found against Lyons on the fraud cause of action—a cause of action that did not allow for the apportionment of damages. When polled, the jury unanimously confirmed this finding. Thus, it appears that Lyons might have chosen not to object to avoid the risk of having a larger verdict entered against him.

Therefore, Lyons's failure to raise the possibility that the verdict was the result of a compromise by jurors on the questions of liability and damages constitutes a waiver of that claim of error.

III.    PROOF OF DAMAGES

A.    Contentions of the Parties

Lyons contends the verdict cannot stand because First American failed to prove that it paid the $591,000 to the person who bought Lot 200 from Lyons in 2005. In particular, Lyons argues that the evidence of payment was never admitted into evidence. Lyons contends the proper method for establishing payment is set forth in Evidence Code section 670, which involves the introduction of a copy of the check together with the original bank statement. Lyons cites *Miller v. Ostly* (1973) 34 Cal.App.3d 190 for the proposition that the offer of substitute evidence is viewed with disfavor.

20.

First American contends that (1) the oral testimony of Teramoto was sufficient to prove that payment had been made; (2) Evidence Code section 670 does not describe the exclusive method for proving the payment, even when that payment was made by check; and (3) there was no evidence disputing the fact that First American had paid the $591,000 to clear the Judgment Lien. First American asserts that the check was excluded from evidence because Teramoto "was not able to explain the reason why the check was made out to U.S. Bank National Association instead of directly to the City of Mendota," which was the entity that held the Judgment Lien.

Lyons's reply brief does not respond to the points raised by First American.

B.      Evidence of Payment

During the trial, First American presented the testimony of Natalie Teramoto, a claims attorney employed by First American whose duties were to investigate, evaluate and respond to title claims. The direct examination of Teramoto included the following:

> "Q      Did you make any decisions as to how to decide to handle to the claim?
>
> "A      Yes.
>
> "Q      What did you decide to do?
>
> "A      We first tried to see if we could work with the City of Mendota to record the subdivision map on behalf of the insured, Lotus Developments, when they submitted a claim. When they refused, we ended up agreeing to pay the lien.
>
> "Q      And did First American pay off the judgment lien?
>
> "A      Yes.
>
> "Q      Okay. And how much did First American pay?
>
> "A      It was $591,000.
>
> "Q      Okay. And whose decision was it to make that payment?
>
> "A      It was mine."

21.

Teramoto subsequently testified that the payment was made in 2007.

First American supports Teramoto's testimony by referring to a recital in the March 22, 2010, settlement agreement and mutual release of all claims that it entered into with Stewart. The settlement agreement was identified at trial and admitted, without objection, into evidence as Exhibit 113. The settlement agreement included 24 numbered paragraphs of recitals. The 19th recital[5] in the settlement agreement stated that First American had paid the $591,000 lien pursuant to the title insurance policy issued by First American to Lyons's successor-in-interest.[6]

## C.     Sufficiency of the Evidence

We conclude that the testimony of Teramoto constitutes substantial evidence that First American paid $591,000 to clear the Lien attached to Lot 200.

First, the testimony of a single witness, even a party to the lawsuit, constitutes substantial evidence. (*In re Marriage of Mix* (1975) 14 Cal.3d 604, 614.) Thus, Teramoto's testimony is not deficient due to lack of corroboration.

Second, Lyons has cited, and we have located, no authority for the proposition that the method for proving payment by means of check set forth in Evidence Code section 670 constitutes the *only* method for proving that a payment by check was made. (See generally, 31 Cal.Jur.3d (2010) Evidence § 140, p. 202 [rebuttal presumption that a check has been paid].) Furthermore, it is obvious from the statutory text that the method set forth in Evidence Code section 670 is not the exclusive or mandatory means for proving

---

**5**     Evidence Code section 622 provides that "facts recited in a written instrument are conclusively presumed to be true as between the parties thereto." This conclusive presumption does not apply to recitals in the settlement agreement because Lyons was not a party to the agreement.

**6**     First American provided title insurance to Lyons's successor-in-interest and accepted responsibility for the Judgment Lien as a result of Lyons's September 2005 claim on Policy No. 492040.

payment because it concerns the use of a *copy* of the check and an *original* bank statement. Interpreting the section as being exclusive or mandatory would preclude the use of the *original* check as a means of proving payment, a result that would not advance any rational legislative purpose.

Because the testimony of Teramoto constitutes substantial evidence regarding the existence and amount of damages, we conclude that Lyons is not entitled to the entry of judgment in his favor based on his claim that First American failed to prove damages.

IV.    ACTUAL KNOWLEDGE OF THE LIEN

A.    Contentions of the Parties

Lyons contends that he is entitled, as a matter of law, to the entry of judgment in his favor because First American's evidence established that Financial Title Company had *actual* knowledge of the Lien in 1999 when it prepared a lot book report for Attorney Robert M. Frost. In addition, Lyons contends that Insurance Code sections 332 and 336 set the parameters of responsibility for disclosure between the parties to an insurance contract. Lyons interprets Insurance Code section 332 to mean he was not required to disclose the Judgment Lien. Alternatively, if disclosure was required, Lyons argues First American waived that disclosure by operation of Insurance Code section 336.

First American contends that (1) Lyons misconstrued Insurance Code section 332 in reaching the conclusion that he had no duty to disclose the Judgment Lien, (2) the waiver provision in Insurance Code section 336 does not apply to the facts of this case, and (3) the knowledge of the Judgment Lien obtained by Financial Title Company in 1999 when it prepared a lot book report for Attorney Frost would not necessarily carry over to a separate transaction completed years later in a different office with different employees and agents.

23.

B.      Insurance Code Section 332

     1.    *Background*

Insurance Code sections 330 through 339 address the concealment of facts during negotiations that occur before the execution of a contract of insurance. Some of these provisions address concealment's counterpart—the disclosure or communication of information. The first disclosure provision sets forth an affirmative duty to communicate information when certain conditions exist. (Ins. Code, § 332.) The second provision approaches the question of disclosure from the opposite perspective. It lists matters that a party to a contract of insurance need not communicate to the other, provided the other does not ask about it. (Ins. Code, § 333.)

     2.    *Statutory Text*

Lyons's argument refers to Insurance Code section 332, the disclosure provision that creates an affirmative duty to disclose. The text of that section provides:

> "Each party to a contract of insurance shall communicate to the other, in good faith, all facts within his knowledge which are or which he believes to be material to the contract and as to which he makes no warranty, and which the other has not the means of ascertaining." (Ins. Code, § 332.)

Lyons contends that this section, along with the waiver provisions in Insurance Code section 336, "set the parameters of responsibility for disclosure between parties to an insurance contract" and the "requirement to disclose is limited to facts '*which the other has not the means of ascertaining*.' [(Ins. Code, § 332.)]"

     3.    *Interpretation and Application*

The primary flaw in Lyons's argument is that the scope of his responsibility to disclose information was not established *solely* by Insurance Code sections 332 and 336. Other provisions of the Insurance Code address a party's obligation to disclose information. For example, the disclosure obligation defined in Insurance Code section 332 does not override or lessen a party's responsibility to disclose information accurately when that party makes a representation or a warranty about a fact relevant to the contract

24.

of insurance. The topic of representations is addressed in Insurance Code sections 350 through 361, and warranties are addressed in Insurance Code sections 440 through 449.

Our conclusion that Insurance Code section 332 was not intended override or lessen the disclosure responsibilities that accompany warranties is based on the text of Insurance Code section 332. It states that a party shall communicate certain material facts "as to which he makes no warranty." This clause indicates that Insurance Code section 332 was not intended to address the disclosure of facts that are the subject of a party's warranty. Therefore, one must look beyond Insurance Code section 332 for the rules of law that define the disclosure obligations of a party providing a warranty.[7]

The foregoing interpretation regarding the scope of the disclosure obligation defined by Insurance Code section 332 is important to the facts of this case because Lyons made a warranty when he signed escrow instructions that falsely certified all liens and judgments had been disclosed to Financial Title Company. (See Ins. Code, §§ 442 [a particular form of words is not necessary to create a warranty], 443 [incorporation of express warranties into policy].)[8] This false certification was the basis for the jury's finding that Lyons intentionally concealed an important fact that caused First American to issue a title insurance policy. Under our interpretation, Insurance Code section 332 does not excuse or justify Lyons's false certification concealing the existence of the Judgment Lien.

---

[7]    This interpretation is reinforced by the text in Insurance Code section 333, which states that a party to a contract of insurance is not bound to communicate information, "except in answer to the inquiries of the other." This exclusion is consistent with our view that the Insurance Code does not allow a party to a contract of insurance to provide false information about a material fact to the other party, whether responding to questions asked by the other party or signing a document containing representations or warranties.

[8]    Lyons has not argued that his certification in the escrow instructions do not constitute a "warranty" for purposes of Insurance Code section 332.

If this court were to apply Insurance Code section 332 in the manner suggested by Lyons, policyholders would be allowed to make inaccurate disclosures by omitting information, so long as the insurance company had other means of ascertaining that information. Lyons has provided no legislative history, case law or secondary authority that indicates the Legislature intended Insurance Code section 332 to protect the concealment of information relating to a matter specifically addressed in the negotiations between the parties. Furthermore, we can find no policy or other justification for applying Insurance Code section 332 in the manner advocated by Lyons.

Therefore, we conclude that Insurance Code section 332 does not insulate Lyons from liability in this case.

C.      Insurance Code Section 336

Insurance Code section 336 provides that a party to a contract of insurance may relinquish the right to information in certain circumstances:

> "The right to information of material facts may be waived, either (a) by the terms of insurance or (b) by neglect to make inquiries as to such facts, where they are distinctly implied in other facts of which information is communicated."

Lyons asserts the second type of waiver occurred in this case—that is, First American waived its right to information about the Judgment Lien by its neglect to make inquiries as to material facts that were distinctly implied in other facts that had been communicated.

In response, First American argues that Insurance Code section 336 does not apply because no waiver was set forth in the terms of the insurance policy and the facts do not show a neglect to make inquiry into facts "distinctly implied in other facts of which information was communicated." (Ins. Code, § 336.) First American also contends it and other insurers have the right to rely on the insured's answers to questions in the insurance application without verifying accuracy of those answers.

26.

Our application of the statutory language to the facts of this case begins with an examination of the "information" that was "communicated." Both Lyons and Stewart expressly informed Financial Title Company in 2002 that there were no other liens or judgments that had not been disclosed. This information about the nonexistence of other liens, when communicated to Financial Title Company by Lyons and Stewart, did not "distinctly impl[y]" the opposite—namely, that other liens exist. Because the existence of the Judgment Lien was not distinctly implied in the information communicated, Lyons has not demonstrated that, by operation of Insurance Code section 336, First American waived the right to information about the Judgment Lien.

D.     Lot Book Report and Actual Knowledge

Lyons contends that Financial Title Company had actual knowledge of the Judgment Lien and this fact is demonstrated by the lot book report Financial Title Company prepared and provided to Attorney Frost in 1999. Lyons further asserts that this actual knowledge compels this court to find, as a matter of law, First American did not reasonably rely on the defective disclosure made by Lyons.

First, under California law, imputing the knowledge of an agent to an insurance company principal is not automatic. (*Civil Service Employees Ins. Co. v. Blake* (1966) 245 Cal.App.2d 196, 199.) The agent must have had some reason or obligation to pass that information along to the insurance company. (*Ibid.*) Here, Lyons has not addressed, much less established, that the individuals who worked at Financial Title Company and were familiar with the contents of the lot book report had a reason or obligation to provide that information about the Judgment Lien to First American. Similarly, the appellate record does not show that the jury was asked to decide whether anyone working at Financial Title Company had a reason or obligation to communicate the information to First American. Because the factual prerequisites for imputing knowledge to an

27.

insurance company do not exist, the information about the Judgment Lien in the lot book report cannot be imputed to First American.

Second, even if we imputed the knowledge to First American and started with the proposition that, in 1999, First American knew that Lot 200 was subject to the Judgment Lien, Lyon's argument still would fail. As a matter of straightforward logic, the fact that First American knew the Judgment Lien existed in 1999 does not lead inexorably to the conclusion that, three years later, First American knew the Judgment Lien still was attached to Lot 200. Because a lien against real property can be satisfied, released or invalidated, First American also would have needed to know that none of these things happened during the intervening period. (See e.g., §§ 697.370 [judgment credit may release a judgment lien], 697.400 [recording a satisfaction of judgment extinguishes the judgment lien].) Without this additional information, First American would not have known that the Judgment Lien still was in effect and, therefore, it could have reasonably relied on Lyons's certification. Because the record does not show that First American actually knew the Judgment Lien had not been satisfied, released or invalidated, we cannot find as a matter of law that First American unreasonably relied on Lyons's certification.

Therefore, we reject Lyons's argument that First American knew the Judgment Lien still impaired the title to Lot 200 in 2002 when Lyons concealed its existence.

## DISPOSITION

The judgment is affirmed. Respondent shall recover its costs on appeal.

28.

_____
Franson, J.

WE CONCUR:


_____
Cornell, Acting P.J.


_____
Detjen, J.